ANNA LAURA PLANT, Respondent, v. GUY A. THOMPSON, Trustee, MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant, No. 41111—221 S. W. (2d) 834.

Division One, June 13, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, July 11, 1949.

*Thomas J. Cole, Oliver L. Salter, Ragland, Otto, Potter & Embry* and *Leon P. Embry* for appellant.

*Everett Hullverson* and *Tudor Gairdner* for respondent; *Joseph Nessenfeld* of counsel.

394

BRADLEY, C.—Action to recover actual and punitive damages for personal injuries received by plaintiff when a passenger on defendant's train. The jury returned a verdict for $20,000 actual damages, but found no punitive damages. Defendant's motion for a new trial was overruled and this appeal followed.

Appellant's defense was based on an assumption of risk provision in the pass on which respondent was riding. She lived with her family in Los Angeles, California; her husband was an employee, motorman, of the Pacific Electric Railway. Her mother, at Corning, Arkansas, was sick and respondent's husband secured a pass for his wife and 10 year old daughter from appellant and other railroads for the wife and daughter to visit the sick mother and grandmother at Corning. The pass, issued by appellant, was dated June 24, 1946, and expired September 24th thereafter; it provided for the transportation of respondent and her daughter from Kansas City to Corning and return. July 10, 1946, respondent and her daughter were on their return trip; they occupied an upper berth on a Pullman in defendant's passenger train from St. Louis to Kansas City. About 1:10 a. m. on that date and 6848 feet west of the station house in Washington, Missouri, the passenger train engine sideswiped or struck appellant's freight engine tender on a switch track; the passenger engine turned over; some coaches in the passenger train were derailed and respondent received the injuries of which she complains.

The pass on which respondent was riding, on its face, provided: "This pass accepted by me subject to the conditions on back." Under this provision respondent had signed her name. On the back the pass provided: "The person accepting and using this pass thereby assumes all risk of accident and injury to person and loss of or damage to property, and also certifies that he or she is not prohibited by law from receiving this pass and that it will be lawfully used." Respondent's trip and the pass were interstate; her cause is therefore governed by federal law, and appellant is not liable unless it was guilty of wilful and wanton negligence. Kansas City Southern Ry. Co. v. Van Zant, 260 U. S. 459, 43 S. Ct. 176, 67 L. Ed. 348; Francis et al. v. Southern Pac. Co., 333 U. S. 445, 68 S. Ct. 611, 92 L. Ed. 798; Pinnell v. St. Louis-San Francisco Ry. Co. (Mo. Sup.), 263 S. W. 182. We might say that the Francis case was the occasion for an article in

the April issue of the Missouri Law Review (14 Mo. Law Rev. 191). Respondent says that the facts pleaded and proved were sufficient to constitute wilful and wanton negligence, or wilful and wanton misconduct, to be more exact. Appellant admits that respondent's injuries resulted from his negligence, but denies that such negligence was wilful and wanton.

Appellant assigns error on the overruling of his motion at the close of the case for a directed verdict. Other assignments are made, but as we view it the assignment on the motion for a directed verdict is decisive and it will not be necessary to consider others.

The engineer on the passenger train was killed when the engine turned over, and the fireman on that train and the fireman on the freight train died of natural causes before the trial. Respondent called as her witnesses the conductor, the two brakemen of the freight train, and the conductor and brakeman of the passenger train. The facts are as follows: At Washington, appellant's tracks are double; the south track is for eastbound trains and the north track for westbound trains. West of the station and between these tracks is what is termed an auxiliary track. At each end of the auxiliary track two tracks (switch tracks) lead off, one to the north mainline track and one to the south mainline track. Shortly before respondent's injury, appellant's eastbound freight train of 82 cars stopped on the south track, alongside the auxiliary track, to set out a car that had a hot box. To do this the freight engine and tender were uncoupled from the train and backed onto the auxiliary track at the east end; it then backed west on the auxiliary track, the purpose being to couple to the rear of the freight train and make the necessary movements to set out the car with the hot box.

The conductor of the freight train rode on the running board of the tender as the engine and tender backed west on the auxiliary track. The engine and tender stopped a few feet east of the switch at the west end of the auxiliary track; the conductor with his lantern looked at the switch; threw it to line, he thought, for the south mainline track on which was the freight train. After the switch was thrown the engine and tender backed west over the switch lined by the conductor, but instead of backing onto the south lead that went to the south mainline track, the engine and tender took the north lead which went to the north mainline track. The mistake was discovered when the tender had moved about 20 feet on the wrong lead; reverse movement was had as soon as possible, but before the tender was in the clear it was sideswiped or struck by the westbound passenger train engine traveling between 20 and 30 miles per hour.

The passenger train had stopped at the Washington station which as stated is 6848 feet east of the point of collision; the headlight on the passenger train engine was on and lighted the track west for 1500 to

1700 feet and 25 to 30 feet on the sides; the freight train engine had only the dimmers on; also there was a light on the rear of the tender. Between the station house (depot) and the point of collision there is a curve, but the track is straight for a distance of 3400 feet east from the point of collision. There was a block light 4000 feet east of the point of collision which would show red, which meant stop, when the conductor threw the switch at the west end of the auxiliary track, but the evidence was that the passenger engine had passed the block light when the switch was thrown. Also, respondent had evidence to the effect that the brakes on the passenger train engine were not applied until the front of the engine was about one and a half car lengths east of the point of collision, and she had expert evidence to the effect that the brakes did not go on until after the impact. No warning whistle was given by either train; and no warning was given the approaching passenger engine by lantern, flares, or otherwise. The freight train crew knew that the passenger train was due at that time at Washington. The engineer on the freight engine said that his fireman "was watching No. 9", the passenger train, to see "whether they had a signal or not."

Respondent's instruction No. 1 told the jury that the terms wilful and wanton "meant an intentional disregard of a known duty necessary to the safety of the person or property of another and the entire absence of care for the life, person or property of others such as exhibits a conscious indifference to consequences or such conduct as is so reckless or wanton as to amount to a reckless disregard of the right of others."

Respondent submitted her case in instruction No. 2 on the hypotheses (1) that the conductor of the freight train knew that the passenger train was a superior train and was approaching and with such knowledge improperly lined the switch when by a proper inspection he would have discovered that he had improperly lined it; (2) that the freight train crew could have done so, but failed to sound a whistle or give signals or warning of the approaching passenger train; (3) that the freight train crew permitted the passenger train to approach without any warning of the position of the freight engine and tender. Instruction No. 2 told the jury that if they found the facts as hypothesized therein *and* found the facts to be "as outlined in instruction No. 3" and "that the acts of conductor Moore (the freight conductor) and the other employees herein mentioned, under such circumstances, were such as amounted to wilful and wanton conduct as defined in these instructions so as to show a reckless disregard of the safety of persons on said train, particularly plaintiff, then the court instructs you that plaintiff is entitled to recover . . . regardless of the fact that plaintiff was riding on a pass."

After hypothesizing certain facts, including the hypothesis that appellant's rules in ▮▮▮ evidence "required that the engineer (on

the passenger train) at such time and the fireman (when his other duties permitted) keep a constant and vigilant lookout and watch for obstructions and defects of track'', instruction No. 3 told the jury that if found that after leaving Washington and while approaching the point of collision the passenger engineer and fireman omitted ''to keep a constant and vigilant lookout ahead and did fail to see the freight engine and tender in time to avoid colliding with the same, and if you further find that there was sufficient time and space there for said engineer and fireman to discover the presence of the said freight engine in a position where the passenger train would be likely to collide therewith in time to avoid said collision with the means at hand, and if you further find that the engineer and fireman of said passenger train did violate the said rules and by their conduct did directly cause the collision referred to and Mrs. Plant's injury, if any, and if you further find that under the circumstances the acts of the engineer and fireman of said passenger train were such as amounted to wilful and wanton conduct as defined in these instructions, so as to·show a reckless disregard of the safety of persons on said train, particularly plaintiff, then the court instructs you that plaintiff is entitled to recover and your verdict should be in favor of the plaintiff and against the defendant, and this is true regardless of the fact that plaintiff was riding on a pass.''

█ Respondent contends that the evidence as to the conduct of the freight train crew and the passenger engineer and fireman made a submissible case on wilful and wanton misconduct. In support of this contention respondent cites: Davis v. McCree, 299 Fed. 142 (cert. denied 266 U. S. ,610, 45 S. Ct. 94, 69 L. Ed. 466); Evens v. Texas Pacific-Mo. Pacific Terminal R. Co. of New Orleans, 134 Fed. (2d) 275 (cert. denied 319 U. S. 756, 63 S. Ct. 1175, 87 L. Ed. 1709); Virginia Beach Bus Line v. Campbell, 73 Fed. (2d) 97; Lacey v. Louisville & N. R. Co., 152 Fed. 134; Rohrer v. Denton, 306 Ill. App. 317, 28 N. E. 573; Annas v. Milwaukee & M. R. Co., 67 Wis. 46, 30 N. W. 282; Walther v. So. Pac. Co., 159 Calif. 769, 116 Pac. 51; Ill. Central R. Co. v. Read, 37 Ill. 484, 485.

In the McCree case the plaintiff was a circus performer and was riding in the circus train; her transportation contract provided that the railroad would not be liable for any injury or damage arising from any cause. The circus train, westbound from Michigan City to Hammond, Indiana, stopped about 4 a. m. on account of a hot box. Following the circus train was a troop train. When the circus train stopped the rear brakeman, with fusees, went back east several hundred feet; swung a lighted fusee across the track in front of the approaching troop train, but the train did not slow down. When the train was almost on him he stepped aside and threw the lighted fusee at the engine cab; got no attention; the engineer was asleep. The troop train engine, without slackening speed, struck the rear of the

circus train, and the plaintiff was severely injured. It would appear from this same case [280 Fed. 959] that the troop train ran through a block signal against it before it reached the point where the brakeman was swinging the lighted fusee. The plaintiff's transportation contract was relied upon as a defense; it was held that the plaintiff made a submissible case on "wilful and wanton negligence" and that the railroad company could not contract with the circus company or its employees "for a release from any wilful and wanton negligence on its part."

In the Evens case, supra, the plaintiff, an old lady 76 years old, had ridden on a pass from Dallas, Texas, to New Orleans; the pass had an assumption of risk provision like the one here. After leaving the train at New Orleans she was following her redcap who was taking her bags to a taxi stand. As she passed through the gate separating the tracks from the vestibule leading to the waiting rooms she was struck from the rear by a loaded rubber-tired cart pushed by another redcap, an employee of the defendant. The cart was piled high with luggage, but the redcap could see over it when standing upright; bystanders shouted warnings to the redcap, but he failed to stop in time. The redcap said that he saw the plaintiff "moving through the gate directly in the path of the cart when he was 25 feet away"; that "he did not look for her again or see her before the accident, but devoted his attention towards seeing that the sides of the cart would clear the gate."

A verdict in the Evens case was returned for the plaintiff; the defendant moved for judgment non obstante verdicto and in the alternative for a new trial; both motions were granted and judgment entered dismissing the cause; the plaintiff appealed; the judgment was reversed and the cause remanded. In ruling the case the court said [134 Fed. (2d) 276-7] : "The negligence of the redcap was not wilful, for that term usually connotes an act intentionally done for the purpose of causing injury, but we think the evidence made an issue for determination by the jury as to whether the servant was guilty of wanton negligence. Wanton negligence may be generally defined as an act (or failure to act when there is a duty to act) in reckless disregard of the rights of another, coupled with a consciousness that injury is a probable consequence of the act or omission. It was negligence for the redcap to propel the heavy vehicle along a passageway occupied by other persons when the luggage impaired his vision of the course that he pursued. That negligence became aggravated when —with knowledge that appellant was just ahead of him, that unless she stepped aside she would be run down, and that the heavily loaded care might cause her serious injuries in the event it should strike her— the redcap continued to push his vehicle through the gate without looking to see that his way had become clear. Such reckless indifference for the safety of appellant, in full awareness of her peril, sup-

ported the express finding of the jury that appellee was guilty of wanton negligence.'' There was a dissenting opinion, but certiorari was denied, as appears, supra.

The Virginia Beach Bus Line case, supra, was an action by a passenger, riding on a pass, for injuries sustained in a collision between the bus and a train. The Norfolk Southern Railroad Company was a party defendant, but was discharged. Special verdicts were returned as to the bus company. Among these were the following: ''Was the plaintiff injured by the negligence of the defendant, Virginia Beach Bus Line, as alleged?'' and ''Was such negligence wilful and wanton as alleged?'' Both of these were answered in the affirmative. The court expressed the opinion that the pass was not without consideration and that the plaintiff was not a gratuitous passenger, but stated it was not necessary to rule such questions because of the view entertained on the question of wilful and wanton negligence. It was held that the evidence was sufficient to support the finding that the negligence of the bus company was wilful and wanton; that negligence ''in operating the bus at a rate of from 55 to 60 miles per hour over a dangerous railroad crossing was clearly wilful and wanton negligence.'' It will be noted that in the Evens case the court implied that there was a difference between wilful negligence, if there could be such, and wanton negligence. The briefs, for the most part, in the present case use the terms wilful and wanton misconduct.

It will not be necessary to review other cases relied upon by respondent; all are distinguishable on the facts from the present case. In the McCree case, supra, the engineer of the offending train went to sleep and the train ran through a block signal against it and because the engineer was asleep the efforts of the brakeman to warn with the lighted fusee proved futile. If the evidence in the present case supported respondent's contention that the passenger train engine had not passed the block signal when it went on at the throwing of the switch by the freight conductor then the situation would be more like the McCree case. But the evidence, as stated, was that the engine of the passenger train had passed this point when the block signal went on. Respondent says the contrary *might be inferred* from the evidence of time, distances, etc., but able counsel does not attempt to demonstrate. In the Evens case the redcap knew the old lady was in front of his cart with her back to it, when ▇ he was 25 feet away, and could have seen her thereafter by looking, but didn't look again; instead his attention was directed ''towards seeing that the sides of the cart would clear the gate.'' The distinction in the Bus Line case is as apparent as in the McCree and Evens cases.

Donnelly v. Southern Pac. Ry. Co. et al., 18 Calif. (2d) 863, 118 Pac. (2d) 465, was an action by a passenger to recover for injuries received while riding on a free interstate pass on an interstate trip; the facts are quite similar to the facts here. In that case the plaintiff

was the wife of an employee of the Railroad Company; the pass was from El Paso, Texas, to Sacramento, California; the plaintiff was injured when the train she was on collided with an eastbound train standing upon a siding in California. An employee of the Railroad Company, improperly set a switch which caused the westbound train to take this siding and collide with the eastbound train. The pass contained this provision: "The person accepting and using this pass, in consideration of using the same, agrees that the Southern Pacific Company shall not be liable under any circumstances for any injury to the person, or for any loss or damage to the property of the individual using the pass; and that as to such person the Company shall not be considered as a common carrier or liable as such."

It was recognized that the federal law governed and that the Railroad Company was liable, notwithstanding the provisions of the pass, if the plaintiff's injuries were caused by the wanton and wilful misconduct of the Railroad Company's employee. The plaintiff recovered in the trial court, but the judgment was reversed. In ruling the case the supreme court of California said: "In the present case the alleged conduct of the switchman does not constitute wanton and reckless misconduct. There is no allegation that he intended to throw the switch the wrong way. Apparently, he did not know he was throwing the switch the wrong way and that harm would probably result. He was guilty of negligence alone. This negligence may have been 'gross' under the California rule but the federal cases are clear that such dereliction constitutes negligence and not wanton and reckless misconduct. 'It would be going a great way to say that the failure of the switch tender to throw the switch so that the train would go on the main line was a wanton and malicious neglect. The only thing that can be said is that someone was careless, and that is admitted.' Shelton v. Canadian Northern Ry Co., C. C., 189 Fed. 153, 160; see Milwaukee & St. Paul Ry. Co. v. Arms, 91 U. S. 489, 23 L. Ed. 374. There is therefore no basis for a finding of reckless and wanton misconduct."

On the subject of wilful and wanton acts, 38 Am. Jur., Sec. 48, p. 692, says: "An omission to exercise care which amounts to a lack of disregard for the safety of others is wilful or wanton. Wilfulness or wantonness imports premeditation or knowledge and consciousness that injury is likely to result from the act done or from the omission to act. Wilful, malicious, or intentional misconduct is not, properly speaking, within the meaning of the term negligence. Negligence and wilfulness are mutually exclusive terms which imply radically different mental states. Negligence conveys the idea of inadvertence as distinguished from premeditation or formed intention. An act into which knowledge of danger and wilfulness enter is not negligence of any degree, but is wilful misconduct. The term negligence, unqualified, covers all those shades of inadvertence which range between deliberate intention on the one hand and total absence of responsible

consciousness on the other, but as long as the element of inadvertence remains in conduct, it is not properly regarded as wilful."

Vol. 2, Restatement, Torts, Sec. 500, p. 1293, defines reckless disregard of safety to another as follows: "The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him." As supporting the definition in Restatement the following cases are cited in the Missouri Annotations thereto: Reel v. Consolidated Investment Co. (Mo. Sup.), 236 S. W. 43; Evans v. Illinois Central R. Co., 289 Mo. 493, 233 S. W. 397; Agee v. Herring, 221 Mo. App. 1022, 298 S. W. 250; Christy v. Butcher, 153 Mo. App. 397, 134 S. W. 1058. See also, Nichols v. Bresnahan, 357 Mo. 1126, 212 S. W. (2d) 570, l. c. 573.

In the Nichols case the court said [212 S. W. (2d) l. c. 573] : "Negligence is one kind of tort, an unintentional injury usually predicated upon failure to observe a prescribed standard of care (52 Am. Jur. Sec. 20) while a wilful, wanton, reckless injury is another kind of tort, an intentional injury often based upon an act done in utter disregard of the consequences."

The conductor of the freight train, as a witness for respondent, testified: "Q. Could you see what you wanted to look at? A. I did see what I wanted to look at. Q. You thought you saw it? A. Yes. Q. What did you see when you looked at it? A. I thought I saw the switch lined for the other track. Q. What did you see? A. I thought I saw the switch lined for the other track. Q. Did you see right or wrong? A. Evidently it must have been wrong. It went out the wrong way. Q. Is there any difficulty of seeing this switch at this switch point? A. Probably isn't. Some men make a mistake in their lives. Q. You just made a mistake, thinking it was lined up right? A. Yes. I made a mistake." Other employees were no more negligent than was the freight conductor.

Appellant's agents were negligent and such is conceded, but their negligence was not such as to make a submissible case on the hypothesis that their conduct was wilful and wanton. The judgment should be reversed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM :—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.